**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| **OWEN WORTHINGTON GAMES**, | ) | **Case No. 4:21-cv-92** |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Demand for Jury Trial |
| | ) | |
| **LG CHEM, LTD, and** | ) | |
| **LG CHEM AMERICA, INC.,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff, Owen Worthington Games, by and through his attorneys of record, and for causes of action against the above-named Defendants complains, alleges, and states as follows:

### I.     PARTIES

1.      Plaintiff Owen Games was and is a resident of Greenville, North Carolina.

2.      Defendant LG Chem America, Inc. ("LG Chem America") is a Delaware corporation with its principal place of business located in Atlanta, Fulton County, Georgia.  At all times relevant hereto, LG Chem America was a distributor and/or seller of various LG products, including but not limited to lithium-ion batteries.

3.      Defendant LG Chem Ltd. ("LG Korea") is a multi-national chemical-based company founded in Korea in 1947. It boasts of leading the global market with its manufacture and sale of lithium-ion batteries, such as the cylindrical 18650 batteries at issue in this case.

4.      Defendant LG Chem America and Defendant LG Korea will collectively be referred to as the "LG Defendants." LG Korea does not maintain any physical presence in the United States.  It has a network of wholly owned subsidiaries in and throughout the United States that work together to sell various products nationwide.

5.      LG Korea documents characterize the business activities of one such subsidiary, Defendant LGCAI, as "sales and trading" of LG Korea's products in the United States.

6.      Upon information and belief, LGCAI is a wholly owned subsidiary of LG Korea and has extensive operations in North Carolina.

7.      LG Korea created LGCAI for the specific purpose of "sales and trading" of LG Chem Korea products in the United States.

8.      LG Korea and LGCAI represent themselves as one and the same in the marketing of their products.

9.      Upon information and belief, LG Korea ships lithium-ion batteries and other products directly into the United States from Korea, and LGCAI - in its role as shipper and distributor - fulfills delivery and distribution of said items both in and throughout the United States. LGCAI takes possession of lithium-ion batteries in the United States and systematically sells, ships, and/or distributes them throughout the United States, including North Carolina.

10.      LG Korea and LGCAI have a yearly revenue of over $278 million attributable to batteries sold or imported into the United States and $2.4 billion worldwide.

11.      LG Korea exercises pervasive and tight control over the sales and trading activities of its subsidiary, LGCAI, and LGCAI was created solely for the purpose of acting as an instrumentality through which LG Korea could sell and distribute its products, including batteries, in the United States.

2

12.     LG Korea designed, manufactured, distributed, sold, and/or otherwise placed the subject battery that injured Plaintiff into the stream of commerce.

13.     The instant case involves the explosion of a lithium-ion battery, and the subject battery, and other similar/identical 18650 lithium-ion batteries, was advertised, marketed, sold, distributed, and placed into the stream of commerce through the engagement of the LG Defendants and one or more distributors and/or retailers who sell and distribute LG products, including the subject battery and similar batteries to consumers.

14.     The LG Defendants sell lithium-ion batteries to Chinese companies known to the LG Defendants to be distributors of e-cigarette and personal vaping products, including 18650 batteries.

15.     The LG Defendants know the Chinese entities to whom they sell their products, including lithium-ion 18650 batteries, distribute said products to e-cigarette and vaping retailers, wholesalers, and distributors in the United States.

16.     LGCAI is registered to do business in only seventeen (17) states; it manages customer accounts, provides marketing support, provides technical support, and conducts external technology research, all on behalf of its corporate parent and product manufacturer, LG Korea.

17.     LG Korea's corporate representative testified in another e-cigarette case pending against it that it knew its batteries were being sold into the e-cigarette market in the United States and injuring American consumers since "the end of 2015 or early 2016."  Deposition of Joon Young Shin in the matter *Flores v. LG Chem, Ltd. et al.*, Case No. 16-cv-297 (November 29, 2017), Southern District of Texas (hereinafter "Shin Dep").  LG Korea was first sued in relation to a battery explosion involving an e-cigarette in early 2016. *Id*.  To this day, LG Korea batteries remain on the selves of e-cigarette stores across the country, including in North Carolina.

3

18.     LG Korea sent affidavits to its small-agent customers because "[t]he idea was that might possibly be a possibility of our agents that deal with small packers and selling our products for E-cigarette purposes." *Id*.

19.     LG Korea continues to sell to these "small agents" and other companies despite its years-long knowledge that its batteries were being sold into the e-cigarette market.

20.     As Mr. Shin testified, "[t]he E-cigarette issue lead to the thought of considering how about adding some warning language."  He further testified in the "early parts of 2016 these E-cigarette issues kept on occurring…these issues started to occur and that's when we started to apply this language, warning language, for protection of *customers* with – with the – considering the possibilities of these incidents happening." *Id*.  Based on the plain language used by LG Korea's corporate representative, LG Korea referred to e-cigarette users as customers, despite LG Korea's protestations that e-cigarette consumers are not "customers."

21.     LG Korea's corporate representative testified that post September 2016, when warnings were added to their batteries, that LG Korea "decided to implement the warning label because we came *to realize that it could be that going into the future the customers* may utlize our cells for such [e-cigarette] purposes."

22.     Mr. Shin further testified LG Korea "became aware of general consumers using batteries – well, the general consumers in the courts of using E-cigarettes were carrying these batteries and we became aware that such can happen." *Id*.

23. Mr. Shin testified LG Korea makes batteries intended for use with e-cigarettes. *Id.* He further admitted the explosion risk of LG Korea's lithium-ion 18650 batteries were not limited to the e-cigarette market: "We're not just talking about E-cigarettes here. That is not the only thing that is the issue. *Any and every application of lithium-ion cells,* it must have a protective circuit. *I don't think that it's the only – it is exclusively the people that use E-cigarettes that can carry around cells in their pockets and that they are the only people that could do it.*"

## I. JURISDICTION AND VENUE

24. Subject matter jurisdiction is appropriate in this Court because there is complete diversity.

25. This Court has personal jurisdiction over Defendant LG Chem Ltd. (hereinafter "LGC") because it actively does business in this District and the State of North Carolina. Defendants have purposefully availed themselves of the benefits, protections, and privileges of the laws of the State of North Carolina through the promotion, marketing, distribution, and sale of the products at issue and have purposefully directed their activities to and conducted their activities in this State. Defendants have sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court permissible.

26. This Court has personal jurisdiction over Defendant LG Chem America Inc. (hereinafter "LGCAI") because it actively does business in this District and the State of North Carolina. Defendants have purposefully availed themselves of the benefits, protections, and privileges of the laws of the State of North Carolina through the promotion, marketing, distribution, and sale of the products at issue and have purposefully directed their activities to and conducted their activities in this State. Defendants have sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court permissible.

5

27.     Plaintiff alleges this Court can exercise jurisdiction over the LG Korea based on their direct contacts with North Carolina, but also the breadth of business it does in the United States more broadly pursuant to *Bristol Myers* and *J. McIntyre*. *See Bristol Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1784 (2017) ("since our decision concerns the due process limits on the exercise of specific jurisdiction by a State, we leave open the question of whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court"); *see also J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 892 (2011) (Breyer, J., concurring) ("Further, the fact that the defendant is a foreign, rather than a domestic, manufacturer makes the basic fairness of an absolute rule yet more uncertain).

28.     Venue is appropriate in this Court because Defendants conduct business here and are subject to personal jurisdiction in this District. Also, substantial acts or omissions giving rise to this lawsuit took place in this District.

## II.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

29.     E-cigarettes, also known as e-cigs, e-hookahs, hookah pens, vapes, vape pens, and mods (customizable, more powerful vaporizers) are battery-operated devices that deliver nicotine through flavoring and other chemicals to users in the form of vapor instead of smoke.[1] They were first patented in 2003 and have been available for sale in the United States since 2007.[2]

30.     E-cigarettes are designed to simulate the act of smoking traditional tobacco, allegedly with less of the toxic chemicals produced by the burning of tobacco leaves.[3] E-cigarettes

---

[1] *See generally*, *Electronic Cigarettes*, National Institute on Drug Abuse, Rev. March 2018, available at https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes.
[2] McKenna, L., *Electronic Cigarette Fires and Explosions in the United States 2009-2016*, U.S. Fire administration, July 2017 available at https://www.usfa.fema.gov/downloads/pdf/publications/electronic_cigarettes.pdf
[3] *See generally*, *Electronic Cigarettes*, National Institute on Drug Abuse, Rev. March 2018, available at https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes.

offer doses of nicotine with a vaporized solution, often referred to as "juice" or "e-liquid," providing a physical sensation similar to tobacco smoke.

31.     Generally, electronic cigarettes operate the same way regardless of the model in that they typically consist of at least three (3) component parts: a tank, a battery that works to heat the juices or e-liquid contained in the tank, and an atomizer that converts the liquid into vapor that the user inhales.

32.     E-cigarettes differ from traditional cigarettes in a critical way: the e-cigarette is battery-operated and uses a heating element to produce vapor, and the traditional cigarette has no electronic component. While both products may produce a similar physical sensation, e-cigarettes pose an additional danger - the battery-powered heating element, as well as the battery itself - that can and have caused explosions, fires, and serious injury.

33.     E-cigarettes are more dangerous than other products that contain lithium batteries because the e-cigarette is most often designed as a cylindrical device, requiring a lithium-ion battery of a similar shape. When the device malfunctions or fails, the battery can be shot out like a bullet or rocket.[4]

34.     At least two deaths have been reported in relation to exploding e-cigarettes.

35.     E-cigarettes have become increasingly popular. They have been marketed as smoking-cessation aids[5] and as a healthier alternative to traditional tobacco cigarettes. The selection of products has grown at an extremely rapid rate.[6]

---

[4] United States Fire Administration, *Electronic Cigarette Fires and Explosions*, October 2012, at p. 5.
[5] *Id.*
[6] Zhu, S. H., Sun, J. Y., Bonnevie, E., Cummins, S., Gamst, A., Yin, L., & Lee, M. (2014). Four hundred and sixty brands of e-cigarettes and counting: Implications for product regulation. Tobacco Control Act 2014, 23: iii3-iii9.

36.     Since their introduction into the United States, sales have risen dramatically from approximately $20 million in 2008 to $2.5 billion in 2012. Industry experts predict the e-cigarette industry will become an $85 billion business within a decade and surpass the tobacco industry.[7]

37.     In January 2014, there were 466 brands of e-cigarettes and over 7,000 unique e-cigarette juice flavors available for sale.[8]

38.     To date, e-cigarette marketing is unfettered and unregulated. Whereas tobacco advertisements have been banned on radio and television for more than 40 years, no such restrictions have been instituted in the e-cigarette arena. Manufacturers, distributors, and sellers of e-cigarettes therefore reach a broader consumer base than the tobacco industry and have the freedom to utilize the same marketing tactics previously employed by big tobacco. Namely, to tout the supposed health benefits of their products absent scientific and medical data to support such claims; to portray e-cigarette smoking as a harmless pastime on TV, radio, and in print; capitalize on individuals already addicted to nicotine; and/or encourage nicotine newcomers (mainly youths and young adults) to pick up the habit.

39.     Federal agencies have begun to recognize the dangers posed by e-cigarettes. In 2017, the United States Fire Administration characterized the "combination of an electronic cigarette and a lithium-ion battery" as a "new and unique hazard" because there is "no analogy among consumer products to the risk of a severe, acute injury presented by an e-cigarette."[9]

40.     Vapor Station holds itself out to the public as having heightened knowledge regarding e-cigarettes and their component parts, including lithium-ion batteries.

---

[7] Clarke, T., *Reports of E-Cigarette Injury Jump Amid Rising Popularity, United States Data Show*, Reuters.com, April 17, 2012.
[8] Zhu, S. H., Sun, J. Y., Bonnevie, E., Cummins, S., Gamst, A., Yin, L., & Lee, M. (2014). Four hundred and sixty brands of e-cigarettes and counting: Implications for product regulation. Tobacco Control Act 2014, 23: iii3-iii9.
[9] McKenna, L., *Electronic Cigarette Fires and Explosions in the United States 2009-2016*, U.S. Fire administration, July 2017.

**The LG Defendants, Their Sale of Lithium-Ion Batteries, and Knowledge That Said Batteries Were Used With E-Cigarettes**

41.     The LG Defendants have known their batteries were being sold into the e-cigarette market and were being used by e-cigarette consumers since 2015.

42.     LG Korea does not maintain any physical presence in the United States.  It has a network of wholly owned subsidiaries in and throughout the United States that work together to sell various products nationwide.

43.     LG Korea documents characterize the business activities of one such subsidiary, Defendant LGCAI as "sales and trading" of LG Korea's products in the United States.

44.     Upon information and belief, LGCAI is a wholly owned subsidiary of LG Korea and has extensive operations in North Carolina.

45.     LG Korea created LGCAI for the specific purpose of "sales and trading" of LG Chem Korea products in the United States.  Additionally, upon information and belief, LGCAI was involved in the design and specification of LG lithium-ion 18650 batteries to be sold in the United States.

46.     LG Korea is a global supplier of products and touts its global reach, nothing LG "is literally the company leading the chemical industry in Korea.  The company has built the global network for production, sales, and R&D not only in Korea but also in main bases across the world and has provided globally competitive products … LG Chem is committed to becoming a global company …." *See* "About Us" page on LG Chem's website, available at https://www.lgchem.com/company/company-information/about.

47.     LG Korea sells its batteries worldwide, utilizing distributors across the globe, including its subsidiary, LGCAI.  The batteries are then redistributed, sold, packaged, transported, or provided to end users in North Carolina and across the United States for use.

9

48.     The regular course and scope of LG Korea's batteries involves the shipping of large quantities of its batteries, both the cylindrical lithium-ion battery at issue here as well as LG Korea's other energy storage products, into and throughout North Carolina and beyond.

49.     Based on information and belief, during at least the years 2012 to the present, LG Korea supplied, sold, shipped, distributed and provided directly to consumers and distributors throughout the State of North Carolina, thousands (if not millions) of its products, including cylindrical lithium-ion batteries, which were sold for use, and used, in North Carolina.

50.     Based on information and belief, LG Korea marketed, advertised, targeted consumers, and promoted the sale of its various products, including lithium-ion batteries, to numerous consumers and distributors throughout North Carolina. Upon information and belief, those distributors, and other distributors located throughout the United States and the world, in turn sold large quantities of products, including LG lithium-ion batteries to wholesalers and retailers located in North Carolina for the direct sale to North Carolina consumers, where said products were purchased by North Carolina residents and used in this State.

51.     In addition to the authorized LG Korea batteries shipped directly to North Carolina, LG Korea also engages, upon information and belief, in a grading process for the various batteries it manufacturers. Upon information and belief, those batteries that fail to achieve a sufficient grade or conform appropriately to standards are not discarded.

52.     Instead, in the interests of profit, LG Korea sells those inferior or nonconforming lithium-ion battery products to other distributors, with LG knowing full well they may be using those batteries for individual electronic or other uses-uses that may not be explicitly authorized but are certainly permitted by LG Korea in the interest of maintaining its profitability.

53.    In addition, based upon information and belief, in the manufacturing process, LG Korea ends up with a significant quantity of batteries with cosmetic defects in the wrapper, without a wrapper at all, or with batteries with other types of cosmetic and other defects. Again, instead of discarding those batteries, LG Korea knowingly sells those substandard batteries to various distributors throughout the world to remove the cosmetically defective or missing wrapper, apply their own wrapping, and then sell those batteries for other uses. One of the principal locations to which LG Korea ships its substandard batteries is Shenzhen, China.

54.    Those batteries are then sold to consumers throughout the world, and readily and rapidly reach North Carolina consumers, all at the reasonable expectation or explicit knowledge of LG Korea. Based on these two avenues, LG Korea ultimately sells huge quantities of lithium-ion batteries that end up in the electronic cigarette market in North Carolina, and end up in the hands of North Carolina consumers, including upon information and belief, the battery at issue in this matter.

55.    Based on information and belief, LG's marketing, advertising, sale, distribution network, and provision of batteries to North Carolina resulted in the use of thousands, if not millions, of LG products, particularly cylindrical lithium-ion batteries, in the State of North Carolina-and comprising one of LG' s primary distribution channels for its products.

56.    LG Korea and LGCAI have a yearly revenue of over $278 million attributable to batteries sold or imported into the United States and $2.4 billion worldwide.

57.    LG Korea exercises pervasive and tight control over the sales and trading activities of its subsidiary, LGCAI, and LGCAI was created solely for the purpose of acting as an instrumentality through which LG Korea could sell and distribute its products, including batteries, in the United States.

58.     LG Korea designed, manufactured, distributed, sold, and/or otherwise placed the subject battery that injured Plaintiff into the stream of commerce.

59.     The instant case involves the explosion of a lithium-ion battery. The subject battery, and other similar/identical 18650 lithium-ion batteries, were advertised, marketed, sold, distributed, and placed into the stream of commerce through the engagement of the LG Defendants and one or more distributors and/or retailers who sell and distribute LG products, including the subject battery and similar batteries to consumers.

60.     LG Chem America is registered to do business in only seventeen (17) states, one of which is North Carolina. It manages customer accounts, provides marketing support, provides technical support, and conducts external technology research, all on behalf of its corporate parent and product manufacturer, LG Korea.

61.     Despite the significant profit LG Korea garners from its United States based business, it asserts it is not subject to the jurisdiction of any court (whether state or federal) in the United States.

62.     For at least the last six years, it has been well known in the electronic cigarette industry, and based upon information and belief, well known to LG, that its lithium-ion batteries were being used in connection with electronic cigarettes and were even *recommended* by multiple online sources for e-cig use.

63.     LG lithium-ion batteries can carry a catastrophic risk of explosion to end users. Indeed, even on the primary search engine used in LG's home country, South Korea, there are *hundreds* of news articles detailing the explosion issues with electronic cigarette batteries such as LG Korea's 18650 battery (the type that exploded here).

12

64.     The first of these articles appear as early as February 2012 and detail a spate of explosions across the world, damaging and burning faces, mouths, hands, legs, and bodies. With respect to administrative action, the U.S. Fire Administration published a report in October 2014 detailing fires and explosions in electronic cigarettes dating back to 2009; the U.S. Department of Transportation permanently banned e-cigs in checked baggage in 2016, and the FDA has been expressing concern for these dangerous products for years. Finally, based on information and belief, LG Korea has been named, or is about to be named, as a defendant in hundreds of electronic cigarette explosions across the country, where one of its batteries has caused catastrophic injuries to people across the U.S. and around the world.

65.     LG Korea's corporate representative testified in another e-cigarette case pending against it that it knew its batteries were being sold into the e-cigarette market in the United States and injuring American consumers since "the end of 2015 or early 2016." Deposition of Joon Young Shin in the matter *Flores v. LG Chem, Ltd. et al.*, Case No. 16-cv-297 (November 29, 2017), Southern District of Texas (hereinafter "Shin Dep"). LG Korea was first sued in relation to a battery explosion involving an e-cigarette in early 2016. *Id.* To this day, LG Korea batteries remain on the selves of e-cigarette stores across the country, including in North Carolina.

66.     LG Korea sent affidavits to its small-agent customers because "[t]he idea was that might possibly be a possibility of our agents that deal with small packers and selling our products for E-cigarette purposes." *Id.*

67.     LG Korea continues to sell to these "small agents" and other companies despite its years-long knowledge that its batteries were being sold into the e-cigarette market.

13

68.     As Mr. Shin testified, "[t]he E-cigarette issue lead to the thought of considering how about adding some warning language."  He further testified in the "early parts of 2016 these E-cigarette issues kept on occurring…these issues started to occur and that's when we started to apply this language, warning language, for protection of *customers* with – with the – considering the possibilities of these incidents happening." *Id*.  Based on the plain language used by LG Korea's corporate representative, LG Korea referred to e-cigarette users as customers, despite LG Korea's protestations that e-cigarette consumers are not "customers."

69.     LG Korea's corporate representative testified that post September 2016, when warnings were added to their batteries, that LG Korea "decided to implement the warning label because we came *to realize that it could be that going into the future the customers* may utlize our cells for such [e-cigarette] purposes."

70.     Mr. Shin further testified LG Korea "became aware of general consumers using batteries – well, the general consumers in the courts of using E-cigarettes were carrying these batteries and we became aware that such can happen."  *Id*.

71.     Mr. Shin testified LG Korea makes batteries intended for use with e-cigarettes.  *Id*. He further admitted the explosion risk of LG Korea's lithium-ion 18650 batteries were not limited to the e-cigarette market: "We're not just talking about E-cigarettes here.  That is not the only thing that is the issue.  *Any and every application of lithium-ion cells,* it must have a protective circuit. *I don't think that it's the only – it is exclusively the people that use E-cigarettes that can carry around cells in their pockets and that they are the only people that could do it.*" *Id*.

72.     LG Chem America claims it was not involved in battery distribution post May of 2016. However, LG Chem America, Inc.'s discovery responses in another e-cigarette case pending against it state LG Chem America, Inc. continued to distribute LG Korea's lithium-ion batters until 2018. *Smith v. LG Chem Ltd., et al.,* Case No. 19A77446, State Court of Dekalb County, Georgia.

73.     Despite Defendants' knowledge, LG batteries are widely, readily, and easily available at electronic cigarette retail stores throughout North Carolina, as well as available for direct shipment online from Amazon, Alibaba, Walmart, and other online retailers. LG has long known, tolerated, and permitted this alternative use of its lithium-ion batteries, as it is a ready profit driver for LG Korea and LGCAI. Only recently, with the spike in explosions of LG batteries - and resulting bad press - has LG taken any action to attempt to stem the tide of its batteries reaching North Carolina shores, posting an insufficient "warning" to its website.  And even then, the "warning" was, upon information and belief, only posted in 2019, and admits that "LG Chem has learned that some individual consumers purchase and use its cylindrical lithium-ion battery cells ... in e-cigarettes and Vape Products that incorporate replaceable and rechargeable individual Li-Ion Cells." *See* Li-ion Battery Safety Guide on LG Chem's website, available at https://www.lgchem.com/safe-cigarette.

**The Injury**

74.     Plaintiff purchased multiple LG lithium-ion 18650 batteries from a vape store called VapeMD, located at 4320 E 10th St. in Greenville, North Carolina.

75.     When Plaintiff purchased the aforementioned LG batteries, he was not provided with any warnings regarding safe use, storage, and transport of lithium-ion batteries.

76.     On or around August 12, 2018, Plaintiff was going to sleep in his room in his grandparents' house and was about to remove the subject LG batteries from his mod to charge them, when he heard the batteries started to sizzle.

77.     Plaintiff attempted to remove the batteries from the mod, but the mod exploded in his right hand.  Plaintiff saw the batteries were glowing red-hot like molten metal and threw them across the room.

78.     The batteries set the bed and an area of carpet alight.  Plaintiff tamped out the fires, grabbed the subject batteries, and carried them with his hands outside of the house to avoid further damage to the house.

79.     Plaintiff went into shock and was taken by his mother to the Emergency Room at Vidant Medical Center in Greenville, North Carolina.

80.     Plaintiff was diagnosed with and initially treated for second and third degree burns to both of his hands.  Shortly thereafter he was referred and discharged to the North Carolina Jaycee Burn Center in Chapel Hill, North Carolina.

81.     Plaintiff was hospitalized there for the following six days.

82.     Plaintiff had been going to school to become a welder and had also been working part-time as a welder while in school.  As a result of his injuries, Plaintiff missed two semesters of school and is still out of work.  Plaintiff's ability to pursue his chosen profession has been severely hampered by his injuries.

83.     Plaintiff has scars that may never fully heal, leaving him with a constant and painful reminder of the explosion.

84.     As a result of the battery explosion, Plaintiff sustained severe, permanent physical and emotional injuries.

## III.    CAUSES OF ACTION

## COUNT ONE
## DEFECTIVE DESIGN AND MANUFACTURE AGAINST LG CHEM, LTD.

85.     Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

86.     At all times herein mentioned, Defendants manufactured, researched, tested, advertised, promoted, marketed, and sold the e-cigarette and lithium-ion battery as herein described above that were used by Plaintiff.

87.     Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

88.     Upon information and belief, the subject e-cigarette and lithium-ion battery that exploded were designed, manufactured, supplied, distributed, and/or sold by Defendants and were defective and unreasonably dangerous.  The dangers and defects in the subject e-cigarette and lithium-ion battery existed at the time the product left the control of Defendants.

89.     The subject e-cigarette and lithium-ion battery manufactured, sold, marketed, and promoted by Defendants were expected to and did reach usual consumers, including Plaintiff.  The e-cigarette products reached Plaintiff and other consumers without substantial change in the condition in which they were produced, manufactured, purchased, sold, distributed, and marketed by Defendants.

90.     The e-cigarette and subject battery designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design formulation in that, when left in the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design of the e-cigarette and subject battery.

91.     The e-cigarette and subject battery designed, researched manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective in design

formulation in that, when left in the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and the products were more dangerous than an ordinary consumer would expect.

92.     The subject e-cigarette and lithium-ion battery were defectively designed, and that defect rendered the e-cigarette and lithium-ion battery unreasonably dangerous to ultimate users, operators, or consumers, including Plaintiff, when sold and distributed by Defendants. The defects in the e-cigarette and lithium-ion battery include, but are not limited to:

a.     the battery failed to operate as safely as an ordinary consumer would expect;

b.     the battery had an unreasonable propensity to heat up and catch fire during foreseeable use and under normal operating conditions; and

c.     The e-cigarette was not fit for use with the lithium-ion 18650 battery.

93.     The e-cigarette and lithium-ion battery were in the same condition at the time Plaintiff was injured as it was when they were originally placed into the stream of commerce and at the time it was ultimately sold to Plaintiff by Defendants.

94.     The defective and unreasonably dangerous condition of the e-cigarette and lithium-ion battery were a direct and producing cause of substantial injuries and damages to Plaintiff.

95.     Safer alternative designs existed, other than the ones used, which were economically and technologically feasible and would have prevented or significantly reduced the risk of injury without substantially impairing the e-cigarette and battery's utility.

96.     Defendants knew or should have known that at all times herein mentioned, the e-cigarette products they manufactured, sold, promoted and marketed, including the lithium-ion battery, were in a defective condition and was inherently dangerous and unsafe.

97.     Defendants designed, manufactured, tested, marketed, promoted, and/or sold the subject battery to the general public even after learning the design and manufacturing defects associated with the subject battery

98.     Plaintiff used the e-cigarette and lithium-ion battery without knowledge of their dangerous characteristics and condition.

99.     Plaintiff used the e-cigarette and subject battery for the purposes for which they were intended and sold by Defendants.

100.    Despite Defendants knowledge that the e-cigarette and subject battery were unreasonably dangerous and defective and that the risk of explosion outweighed any benefits, Defendants voluntarily designed, marketed, distributed, and sold the e-cigarette and lithium-ion battery.

101.    The e-cigarette and lithium-ion battery designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were manufactured defectively in that the products left the hands of Defendants in a defective condition and were unreasonably dangerous to their intended users.

102.    Defendants created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

103.    Plaintiff could not, in the exercise of reasonable care, have discovered the e-cigarette and lithium-ion battery's defects herein mentioned, nor could Plaintiff have perceived their danger.

104.    By reason of the foregoing, Defendants are strictly liable to Plaintiff for the manufacture, marketing, sale, promotion, and distribution of defective products, namely the e-cigarette and lithium-ion battery.

19

105. Defendants' defective design of the e-cigarette and lithium-ion battery amounts to willful, wanton, and/or reckless conduct by Defendants.

106. Defects in the e-cigarette and lithium-ion battery designed, manufactured, marketed, sold, promoted, and/or distributed by Defendants were the cause or a substantial factor in causing Plaintiff's injuries.

107. As a result of the foregoing acts and omissions, Plaintiff suffered severe and personal injuries, where are permanent in nature, physical pain and mental anguish, including financial expenses for hospitalization and medical care.

**COUNT TWO**
**INADEQUATE WARNING OR INSTRUCTION AGAINST ALL DEFENDANTS**

108. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs and incorporates those allegations by reference as if fully stated herein.

109. Defendants engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting the e-cigarette and lithium-ion battery, and through that conduct knowingly and intentionally placed the e-cigarette and lithium-ion battery into the stream of commerce with full knowledge that the products reach consumers such as Plaintiff who are exposed to said products via ordinary and reasonably foreseeable uses.

110. Defendants did in fact sell, distribute, supply, manufacture, market, and/or promote the e-cigarette and lithium-ion battery to Plaintiff. Additionally, Defendants expected the e-cigarette and lithium-ion battery that they were selling, distributing, supplying, manufacturing, marketing, and/or promoting to reach consumers, including Plaintiff, without substantial change in the condition of the products from when they were initially manufactured and distributed.

111. At the time of manufacture or sale, Defendants could have provided the warnings or instructions regarding the full and complete risks the e-cigarette and lithium-ion battery posed

because it knew or should have known of the unreasonable risks of harm associated with the use of said products.

112.   At all times mentioned herein, the aforesaid products were defective and unsafe in manufacture such that they were unreasonably dangerous to the user, and were so at the time they were manufactured, distributed, and sold by Defendants and at the time Plaintiff was exposed to and/or used the products.  The defective condition of the e-cigarette and lithium-ion battery was in part due to the fact that the products were not accompanied by proper warnings regarding the propensity of said products to overheat, explode, short-circuit, and/or experience thermal runaway.

113.   Neither the e-cigarette nor the lithium-ion battery contained warnings or caution statements which were necessary, and if complied with, were adequate to protect the health of consumers.

114.   Defendants' failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, violated the laws of North Carolina.

115.   Defendants could have added a warning label to the e-cigarette and lithium-ion battery to provide warnings to consumers.

116.   The defect caused serious injury to Plaintiff who used the e-cigarette and lithium-ion battery in their intended manner.

117.   The defect caused serious injury to Plaintiff who used the e-cigarette and lithium-ion battery in a foreseeable manner.

118.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, test, inspect, package, label, distribute, market, examine, maintain, supply, provide

proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

119.    Defendants labeled, distributed, promoted, marketed, and sold the e-cigarette and lithium-ion battery even though they were dangerous and unsafe for the use and purpose for which they were intended.

120.    Defendants failed to warn of the nature and scope of the dangers posed by the e-cigarette and lithium-ion battery, namely their propensity to overheat, short-circuit, and/or explode.

121.    Despite the fact that Defendants knew or should have known that the e-cigarette and lithium-ion battery caused serious injuries, Defendants failed to warn of the dangerous propensity of the e-cigarette and lithium-ion battery to overheat, short-circuit, and/or explode.

122.    These risks were known or knowable at the time of distribution, sale, and marketing.

123.    Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

124.    At the time of use, Plaintiff could not have reasonably discovered any defect in the e-cigarette and lithium-ion battery through the exercise of reasonable care.

125.    Defendants, as the manufacturer, marketer, distributor, and/or seller of the subject products, are held to the level of knowledge of an expert in the field.

126.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

127.    Had Defendants properly disclosed the risks associated with the e-cigarette and lithium-ion battery, Plaintiff would have avoided the risk of explosion by not using the e-cigarette and lithium-ion battery and would have purchased a safer alternative.

128.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to use the product safely, with adequate protection, and/or opt to use a safer alternative product readily available to consumers.

129.    Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the risk of injuries associated with use of e-cigarettes and lithium-ion batteries; continued to promote said products even after it knew or should have known of the unreasonable risks from use, and concealed, downplayed, or otherwise suppressed, through marketing and promotion, any information about the risks and dangers of e-cigarettes and lithium-ion batteries.

130.    To this day, Defendants fail to adequately warn of the true risks of Plaintiff's injuries associated with the use of the e-cigarette and subject battery.

131.    As a result of their inadequate warnings, the e-cigarette and subject battery were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by Plaintiff.

132.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject products caused Plaintiff to sustain injuries herein alleged.

133.    Plaintiff seeks compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

## COUNT THREE
## NEGLIGENCE AGAINST ALL DEFENDANTS

134.    Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

135.    Defendants owed a duty to Plaintiff and other users of their products to exercise due care in the design, manufacture, distribution, marketing, testing, and /or sale of the subject battery.

136.    Defendants were negligent in one or more of the following ways, each of which was a proximate cause of Plaintiff s injuries and damages including:

    a.    Failing to employ that degree of care which is required of a reasonably prudent designer, manufacturer and seller in the design, manufacture, advertisement, marketing, distribution, sale, and placement into the stream of commerce of the subject battery;

    b.    Failing to conduct adequate safety testing and inspection of the subject battery in order to properly determine whether they were capable of performing their intended use; and

    c.    Failing to adequately instruct and/or warn the consumer and user, particularly Plaintiff, of the potential danger(s) posed by the subject battery, particularly in personal vaping devices;

    d.    Failing to protect against the dangerous consequences of battery failure during the normal and foreseeable use of these products

    e.    Failing to incorporate into the subject battery internal temperature controls and/ or protection circuitry.

    f.    Failing to incorporate feasible safety features available in similar products in the industry;

24

g.  Placing a battery into the stream of commerce that failed to comply with generally accepted engineering safety standards applicable to lithium-ion batteries; and

h.  Failing to adequately test the subject battery under conditions which the LG defendants should have anticipated its products would be used; and

i.  Knowingly selling and distributing the subject battery for a use for which it was not designed.

137.  Defendants' negligence was the proximate cause of Plaintiff's injuries and damages.

## COUNT FOUR
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST ALL DEFENDANTS

138.  Plaintiff incorporates the preceding paragraphs by reference as if fully stated herein.

139.  Because of their inherent design defects, the subject batteries are not fit for the ordinary purpose for which they are used.

140.  Because the subject batteries are not fit for the ordinary purpose for which they are used, Defendants' sale of the same breached the implied warranty of merchantability.

141.  Any attempts by Defendants to disclaim the implied warranty of merchantability were unconscionable because to the extent the disclaimers were made, they were made with the full knowledge of the inherently dangerous defect encumbering each battery.

142.  Specifically, the LG entities withheld information regarding the inherently dangerous condition of the lithium-ion batteries, including the subject batteries. The Defendants created a one-sided condition herein they knew Plaintiff was presuming its decision to purchase the goods subject to flawed and incomplete information, resulting in unfair surprise to Plaintiff when he eventually learned of the inherently dangerous nature of the batteries.

143.    Plaintiff suffered personal injury as a result of Defendants' breach.

144.    But for Defendants' breach of implied warranty of merchantability, Plaintiff would not have suffered the damages articulated herein.

145.    The LG Defendants' breach was the proximate cause of Plaintiff's injuries and damages.

## IV.    PRAYER FOR RELIEF

WHEREFORE, Defendants' conduct as described herein was the direct and producing cause of serious injuries and damages to Plaintiff. Plaintiff therefore seeks recovery for damages suffered as a result of Defendants' conduct, including all remedies allowed at law, general and special, including but not limited to the following elements of damages:

a.   For general damages according to proof;

b.   For special damages according to proof;

c.   For punitive and exemplary damages against Defendants, the bases for which will be proved at trial.  Said exemplary and punitive damages are appropriate and awardable pursuant to the action of Defendants described above, including wanton, willful, and reckless acts of commission and omission, and outrageous and malicious conduct, in an amount in favor of Plaintiff, all totaled to an amount sufficient to punish Defendants so as to deter it and other from similar wrongdoing;

d.   Pre-judgment interest;

e.   Post-judgment interest;

f.   For cost of suit incurred herein;

g.   Any such further legal and equitable relief as this Court may deem Proper

## V.    JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury for all issues so triable under the law.

Dated: July 6, 2021

Respectfully submitted,

*/s/ Scott C. Harris*
Scott C. Harris
NC State Bar No. 35328
**Milberg Coleman Bryson Phillips Grossman PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (916) 600-5000
Facsimile: (919) 600-5035
sharris@milberg.com

William A. Levin
*To Be Admitted Pro Hac Vice*
Angela J. Nehmens
*To Be Admitted Pro Hac Vice*
**Levin Simes Abrams LLP**
1700 Montgomery Street, Suite 250
San Francisco, CA 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
wlevin@levinsimes.com
anehmens@levinsimes.com

***Attorneys for Plaintiff***

27